## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA STOYER,         :
                             :

          Plaintiff       :    **No. 3:13-CV-2481**

                             :

          vs.             :    **(Judge Nealon)**

                             :

CAROLYN W. COLVIN,[1] Acting  :
Commissioner of Social Security,  :

                             :

          Defendant   :

FILED
SCRANTON
AUG 2 8 2014
PER _____
DEPUTY CLERK

### MEMORANDUM

On September 30, 2013, Plaintiff, Barbara Stoyer, filed this appeal[2] under 42 U.S.C. § 405 for review of the decision of the Commissioner of Social Security denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 400-403. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB and SSI will be affirmed.

### BACKGROUND

---

1. Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration ("SSA") on February 14, 2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

Plaintiff protectively filed[3] her application for DIB on September 8, 2010. (Tr. 12).[4] This claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on January 20, 2011. (Tr. 12). On April 1, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 12). A hearing was held on January 18, 2012 before administrative law judge Therese A. Hardiman ("ALJ"), at which Plaintiff and vocational expert, Karen Kane ("VE"), testified. (Tr. 12). On March 28, 2012, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff's impairments did not meet or medically equal any impairment Listing and Plaintiff could perform a full range of work at all exertional levels with several nonexertional limitations. (Tr. 15-20).

On May 2, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On August 7, 2013, the Appeals Council concluded that there

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 16, 2013. (Doc. 9).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

was no basis upon which to grant Plaintiff's request for review. (Tr. 2-4). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on September 30, 2013. (Doc. 1). On December 16, 2013, Defendant filed an Answer and Transcript from the Social Security Administration ("SSA") proceedings. (Docs. 8 and 9). Plaintiff filed the brief in support of her complaint on April 19, 2014.[6] (Doc. 12). Defendant filed a brief in opposition on July 7, 2014.[7] (Doc. 17). Plaintiff filed a reply brief on July 24, 2014. (Doc. 18). The matter is now ripe for review.

Disability insurance benefits are paid to an individual if that individual is disabled[8] and insured, that is, the individual has worked long enough and paid

---

6. Plaintiff's request for an extension of time to file her support brief was granted, extending the time to file her brief to April 19, 2014. (Doc. 11).

7. Defendant's two motions for extensions of time to file a brief in opposition were granted, extending the time to file the brief to July 23, 2014. (Docs. 14 and 16).

8. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,

3

social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the date last insured.  It is undisputed that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.  (Tr. 14).

Plaintiff was born in the United States on August 13, 1962, and at all times relevant to this matter was considered a "younger individual"[9] whose age would not seriously impact her ability to adjust to other work.  20 C.F.R. §§ 404.1563(c); (Tr. 21).

Plaintiff obtained her high school diploma, and can communicate in

---

engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

9.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

English. (Tr. 107, 109). Her employment records indicate that she previously worked as a press machine operator for Tyco Electronics from 1998 to 2010. (Tr. 109).

The records of the SSA reveal that Plaintiff had earnings in the years 1981 through 2010. (Tr. 90). Her annual earnings range from a low of seven hundred fifty dollars and fifty-three cents ($750.53) in 1983 to a high of thirty-four thousand three hundred eighty-seven dollars and twenty-three cents ($34,387.23) in 2000. (Tr. 91). Her total earnings during those twenty-nine (29) years were four hundred seventy-six thousand one hundred forty-three dollars ($476,143.00). (Tr. 91).

Plaintiff's alleged disability onset date is August 11, 2010. (Tr. 104). The impetus for her claimed disability is a combination of diabetes, arthritis, high cholesterol, hypothyroidism, and stress. (Tr. 108). In a document entitled "Function Report - Adult" filed with the SSA in November of 2010, Plaintiff indicated that she was single and lived with a friend. (Tr. 123-124). She indicated that she had no problems with personal care, prepared her own meals daily, and took care of her cat. (Tr. 123-125). She also noted that she could wash the dishes and laundry. (Tr. 123, 125). She had someone else do her yard work, help her clean, and shovel snow. (Tr. 125). She would shop for groceries in stores once a

5

week for a half hour to one (1) hour at a time. (Tr. 126). She could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 126). She indicated that she would either walk or ride in a car when traveling, but did not drive because she did not have a vehicle. (Tr. 126).

Regarding her concentration and memory, Plaintiff denied having memory problems or needing special reminders to take care of her personal needs and to take her medicine. (Tr. 125). She also stated that she did not need anyone to accompany her when she left her house. (Tr. 127). She could pay attention for twenty (20) to thirty (30) minutes, usually needed people to repeat spoken instructions, and did "ok" with written instructions after reading them "a couple of times to get it right." (Tr. 128).

Socially, Plaintiff would email, text, and call friends. (Tr. 127). She liked to watch sports and listen to music. (Tr. 127). In the function report, when asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, completing tasks, understanding, following instructions, and getting along with others. (Tr. 128).

Regarding medications, Plaintiff reported she needed glasses for eyesight, and knee and hand braces to help with the inflammation from her arthritis, all of which were prescribed by a doctor. (Tr. 129). She was also prescribed

Alendronate for osteoporosis, Citalopram for anxiety, Glimepiride for diabetes, Levothyroxine for hypothyroidism, and Simvastatin for high cholesterol. (Tr. 135).

At her hearing, Plaintiff alleged that the following combination of physical problems prevented her from being able to work since August of 2010: (1) arthritis in her left hip and lower back; (2) diabetes; (3) stress; (4) hypothyroidism; and (5) high cholesterol. (Tr. 37-52). In terms of physical limitations, she testified that she could go up and down the stairs about five (5) times a day, extend her legs when seated, and reach overhead "somewhat" because it caused her to lose her balance due to pain in her hip. (Tr. 35). She could only stand for about ten (10) to fifteen (15) minutes before needing to sit or walk, and could sit for about a half hour before needing to stand, again due to pain in her hip. (Tr. 36, 40-41). She could not walk more than one (1) block, and used a non-prescribed cane for walking. (Tr. 37). Plaintiff was able to clean her house, and wash her dishes and laundry. (Tr. 34). She could sleep for about eight (8) hours, but had to change positions frequently during the night. (Tr. 36, 42). She also would elevate her left leg about three (3) times a day to relieve the pain. (Tr. 42).

Plaintiff testified that the more she would do physically, the more her blood sugar levels would drop. (Tr. 39). She testified that she was taking her

7

medications as prescribed, and following a diabetic diet. (Tr. 38-39). At the time

of her hearing, she was experiencing one (1) diabetic episode a week, during

which she would become fatigued, weak, light-headed, and confused and would

experience difficulty breathing. (Tr. 38-39, 44-46). These episodes typically

happened when her blood sugar level reached one hundred twenty (120) or higher.

(Tr. 44, 46). At times she would become incoherent, with an episode that

required an emergency room visit in 2009 that occurred while she was working as

a press machine operator. (Tr. 45). She would have to eat and take her

Glimepiride to alleviate her symptoms, which would take a half an hour. (Tr. 46-

47). She testified that she was not allowed to eat while working in the medical

department as a press machine operator, but that even when she was transferred to

a different position that allowed her to eat and drink at will, she still experienced

episodes because of the physical activity and stress involved that worsened her

diabetes symptoms. (Tr. 48).

Plaintiff stated that, after she attempted suicide, her doctor indicated that she

should stop working because of her inability to handle stressful situations which in

turn worsened her diabetes symptoms. (Tr. 49-50). She explained that while at

work, she was too stressed about controlling her sugar and being able to eat and

drink. (Tr. 50). She quit her job when she was told that she had to go back to her

8

position as a press machine operator.  (Tr. 50).

## MEDICAL RECORDS

Before the Court addresses the ALJ's decision and the arguments of

counsel, Plaintiff's relevant medical records will be reviewed in detail, beginning

with records from his alleged disability onset date of August 11, 2010.

On October 15, 2010, Plaintiff was admitted to the Schuylkill Medical

Center for a suicide attempt by prescription drug overdose after receiving a letter

from her employer suggesting she go on disability.  (Tr. 206, 235-236).  Her blood

work from this admission revealed high blood glucose levels.  (Tr. 207).  Her prior

diagnoses of diabetes, arthritis, hypothyroidism and hyperlipidemia were noted

and affirmed.  (Tr. 251).  She denied taking the medications that had been

prescribed to her, including Actos, Lexapro, Crestor and Synthroid.  (Tr. 239).

Upon psychiatric evaluation, she was diagnosed with major depressive disorder,

single episode, with employment as a psychosocial stressor.  (Tr. 235, 248).  Upon

discharge on October 20, 2010, she was prescribed Lexapro, Crestor,

Levothyroxine, Celebrex, Celexa, Amaryl, Zocor, and Actos, and her Global

Assessment Function ("GAF")[10] score was between thirty-five (35) and forty (40).

---

10. The GAF score allows a clinician to indicate his judgment of a person's overall
psychological, social and occupational functioning, in order to assess the person's
mental health illness. Diagnostic and Statistical Manual of Mental Disorders, 4th

(Tr. 235, 265-267, 271).  She was also referred to intensive psychological therapy.

(Tr. 248).

On December 22, 2010, Plaintiff had an appointment with Dr. Chimahosky

for a disability evaluation for left hip pain.  (Tr. 272).  He stated the following:

> The patient is an extremely poor historian with multiple
> unrelated complaints.  Her tangential thought process and
> incessant talking made it difficult to focus on the reason of her
> seeking disability benefits.  She states she was diagnosed with
> diabetes in September 2009 and this caused her [a] myriad of
> problems.  She was working full time at an electronics
> manufacturing plant when issues with blood sugar caused her
> to have administrative conflicts which ultimately led her to quit
> her job.  Then she described diffuse muscle pain as a result of
> riding horses throughout her life causing left hip and left knee
> pain.  She also mentioned a history of right shoulder bursitis
> and a suicide attempt on October 15 of this year by
> intentionally overdosing on her diabetes medicine.  When
> attempting to focus on one problem for which she seeks
> disability, she mentioned left hip pain.

(Tr. 272).  Her physical exam was normal, and Dr. Chimahosky diagnosed her

with osteoarthritis in multiple sites and diabetes mellitus type II.  (Tr. 273).  An x-

---

edition, Text Revision (2000).  A GAF score of 21-30 represents behavior
considerably influenced by delusions or hallucinations or serious impairment in
communication or judgment or inability to function in almost all areas.  A GAF
score of 31-40 represents some impairment in reality testing or communication or
major impairment in several areas,  such as work or school, family relations,
judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious
symptoms or any serious impairment in social, occupational or school functioning.
Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate
difficulty in social, occupational, or school functioning. Id.

ray ordered by Dr. Chimahosky and performed on December 22, 2010, showed

mild degenerative changes in Plaintiff's left hip and no acute fracture.  (Tr. 281).

He prescribed Celebrex for the arthritis, and Actos for the diabetes.  (Tr. 273-274).

In the medical source statement of Plaintiff's ability to perform work-related

physical activities, Dr. Chimahosky opined that she could frequently lift and carry

two (2) to three (3) pounds, but only occasionally lift and carry ten (10) pounds.

(Tr. 277).  Further, Dr. Chimahosky opined that Plaintiff could stand and walk for

less than one (1) hour in an eight (8) hour day, but had no limitations for sitting,

pushing and pulling.  (Tr. 277).  Regarding postural activities, Plaintiff could

occasionally bend, kneel, stoop, crouch, balance, and climb.  (Tr. 278).  There

were no other physical function or environmental limitations.  (Tr. 278).

Plaintiff had an appointment with Psychologist David F. O'Connell on

December 30, 2010.  (Tr. 286).  Dr. O'Connell remarked that Plaintiff's ability to

understand, remember, and carry out instructions was affected by the mental

impairments.  (Tr. 286-288).  Dr. O'Connell also opined that in relation to this

impairment, Plaintiff would have no restrictions understanding, remembering and

carrying out short, simple instructions, would have slight restrictions

understanding and remembering detailed instructions, would have moderate

restrictions in carrying out detailed instructions, and would have marked

restrictions in making judgments on simple work-related decisions. (Tr. 288).

Furthermore, Dr. O'Connell opined that Plaintiff would have moderate restrictions

in responding appropriately to work pressures in a usual setting, and marked

restriction in responding appropriately to changes in a routine work setting. (Tr.

288). Her GAF score at this visit was a thirty-eight (38). (Tr. 294).

On January 7, 2011, Jonathan Rightmeyer, Ph.D. filled out a Psychiatric

Review Technique form. (Tr. 296). It is not clear whether Dr. Rightmeyer

examined Plaintiff himself. He indicated that he was filling out this form for a

residual functional capacity ("RFC") assessment. (Tr. 296). He opined that

Plaintiff's impairments did not meet the criteria for Listing 12.04, Affective

Disorders, or 12.06, Anxiety-Related Disorders. (Tr. 299). Under the "Rating of

Functional Limitations" section that addressed "B" criteria of the Listings, Dr.

Rightmeyer opined that for Listings 12.04 and 12.06, Plaintiff had mild restriction

of activities of daily living and difficulties in maintaining social functioning,

moderate difficulties in maintaining concentration, persistence or pace, and one

(1) or two (2) repeated episodes of decompensation, each of extended duration.

(Tr. 306). Regarding "C" criteria of Listings 12.04 and 12.06, Dr. Rightmeyer

opined that "evidence does not establish the presence of the "C" criteria." (Tr.

307).

12

Dr. Rightmeyer also completed a "Mental Residual Functional Capacity Assessment" form. (Tr. 309). Dr. Rightmeyer opined that Plaintiff had moderate limitations only in the ability to maintain attention and concentration for extended periods. (Tr. 309). In every other category, Plaintiff was marked as not being significantly limited. (Tr. 309-310). Dr. Rightmeyer disagreed with the opinion rendered by Dr. O'Connell, stating that his report was inconsistent with the totality of evidence in the file, and that the opinions cited in the report were an overestimate of the severity of Plaintiff's functional restrictions and inconsistent with objective medical and non-medical evidence. (Tr. 331). Ultimately, Dr. Rightmeyer determined that, "[Plaintiff] is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (Tr. 311).

On January 19, 2011, Erin Austin, M.D. completed a "Physical Residual Functional Capacity Assessment" form. (Tr. 312). She opined that Plaintiff could occasionally lift and carry twenty (20) pounds, frequently lift and carry ten (10) pounds, stand and/ or walk for about six (6) hours in an eight (8) hour workday, and engage in unlimited pushing and/ or pulling. (Tr. 313). She also opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 313-315). Dr. Austin agreed that the medical evidence

13

established a medically determinable impairment of diabetes type II and mild degenerative joint disease. (Tr. 317). Dr. Austin reviewed prior medical evidence and the record, and determined that Plaintiff was partially credible, but that the earlier reports were inconsistent with the totality of evidence in the file, and were an overestimate of the severity of Plaintiff's functional restriction. (Tr. 317-318).

From January to March of 2011, Plaintiff had approximately six (6) appointments with Dr. Martha Murry and her partner, mental health therapist Tammy Munster. (Tr. 328). Her initial intake summary stated that Plaintiff had depression and anxiety stemming from her unstable financial situation and her health problems. (Tr. 337). The therapist reiterated the original diagnosis of Major Depressive Disorder, but classified it not as single episode, but rather recurrent and severe. (Tr. 334). She also diagnosed Plaintiff with anxiety. (Tr. 334). She recommended that Plaintiff continue on her prescribed medicines. (Tr. 334).

Plaintiff had an appointments with Dr. Scalia for a check-up on the following dates: February 14, 2011, March 31, 2011, June 30, 2011, and July 14, 2011. (Tr. 345, 348, 354, 357). At all of these appointments, Plaintiff stated that she had chronic left hip pain that she was treating with Tylenol, and refused an orthopedic appointment. (Tr. 345, 348, 354, 357). She indicated that her anxiety

was under good control, was compliant with taking her Citalopram, and denied any suicidal ideations. (Tr. 345, 348, 354, 357). She also refused blood work. (Tr. 346, 349, 355). She reported arthralgias and pain, but denied myalgia and numbness. (Tr. 345, 348, 354, 357). She had decreased range of motion in her left hip, but a normal gait. (Tr. 345-346, 348-349, 354-355, 357-358). Dr. Scalia instructed Plaintiff to continue taking the following medications: Fosamax, Citalopram, Amaryl, Synthroid, and Zocor. (Tr. 346, 351, 355, 358). Eventually, on June 30, 2011, Dr. Scalia switched Plaintiff from Zocor to Simvastatin. (Tr. 349).

At her July 14, 2011 appointment, Dr. Scalia completed a disability form titled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" for Plaintiff. (Tr. 345, 364). In this form, Dr. Scalia opined that Plaintiff's prognosis was poor due to chronic left hip and low back pain. (Tr. 364). In an eight (8) hour work day, he opined that Plaintiff could sit for up to two (2) hours, stand/ walk for one (1) hour, and would need to alternate between sitting and standing every ten (10) minutes to relieve discomfort and pain. (Tr. 364). He stated that Plaintiff was medically required to use crutches and one (1) cane for ambulation. (Tr. 364). Dr. Scalia also indicated that Plaintiff could never lift or carry anything of any weight, could never push or pull using her upper or

15

lower extremities, could never climb ramps, ladders, ropes or scaffolding, and could never bend, stoop, kneel or crouch. (Tr. 364). Plaintiff could only rarely climb stairs or balance. (Tr. 364). Regarding manipulative limitations, Dr. Scalia opined that Plaintiff could occasionally reach in all directions and handle objects, and could frequently use fingering and feeling maneuvers. (Tr. 365). Regarding environmental limitations, he indicated that Plaintiff had to avoid the following: temperature extremes, dust, vibration, humidity/ wetness, hazards, and fumes. (Tr. 365). In terms of accommodations, Plaintiff would need unscheduled breaks, walking and reclining breaks, and excessive restroom breaks for fifteen (15) minutes every hour. (Tr. 365). He opined that Plaintiff would likely be absent from work for three (3) or more days per month. (Tr. 365).

On October 21, 2011, Plaintiff had an appointment with Dr. Scalia. (Tr. 339). Plaintiff reported that she had not been taking the medicines prescribed to her, but that she would restart them. (Tr. 339). She indicated that she could keep herself "safe," and that she did not need another psychiatric evaluation at that time. Tr. 340). She denied anxiety, fatigue, and fever. (Tr. 340). However, a nurse noted that Plaintiff stated that her sugar had been in the five hundreds (500's) and that she had been feeling suicidal. (Tr. 343). Her problem list included the following: contusion of the hip, osteoporosis, hypothyroidism,

16

hypercholesterolemia, diabetes type II, major recurrent depressive disorder, and generalized anxiety disorder. (Tr. 340). She had a normal gait, no edema of her extremities, and appeared healthy. (Tr. 341). Her diagnoses from that appointment included hypercholesterolemia, diabetes type II, hypothyroidism, and generalized anxiety disorder. (Tr. 339). As of that visit, Plaintiff was taking the following medications: Simvastatin; Fosamax; Citalopram; Amaryl; and Synthroid. (Tr. 339).

On November 23, 2011, Plaintiff presented to the emergency room at Penn State Milton Hershey Medical Center for a fainting episode. (Tr. 367, 369). Plaintiff's ct scan of her brain and x-ray of her lungs were negative. (Tr. 367). She was instructed to follow up with her primary care physician by the following week, and to return to the emergency room with any worsening symptoms. (Tr. 372). On November 28, 2011, Plaintiff had an appointment with Dr. Scalia. (Tr. 374). Dr. Scalia prescribed Glimepiride in addition to Plaintiff's other medications. (Tr. 374).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

19

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d

at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.  (Tr. 14). The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled.  (Tr. 22).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of August 11, 2010.  (Tr. 14).

At step two, the ALJ determined that Plaintiff suffered from the severe[11] combination of impairments of the following: "major depressive disorder (MDD) and anxiety (20 C.F.R. 404.1520(c))."  (Tr. 14).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or

_____

11.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 15).

At step four, the ALJ determined that Plaintiff had the residual functional

capacity ("RFC") to perform a full range of work at all exertional levels. (Tr. 16-

18). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that [Plantiff] has the residual functional capacity to
> perform a full range of work at all exertional levels[,] but with
> the following nonexertional limitations: [s]he can occasionally
> climb, balance and stoop. [Plaintiff] can never climb on
> ladders, kneel, crouch or crawl. [Sh]e must avoid hazards,
> including heights and moving machinery. [Plaintiff] is limited
> to simple routine tasks, low stress work as defined as only
> occasional decision-making, and only occasional changes in
> the work setting.

(Tr. 16).

At step five of the sequential evaluation process, considering the Plaintiff's

age, education, work experience, and RFC, the ALJ determined "there are jobs that

exist in significant numbers in the national economy that the [Plaintiff] can

perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between the alleged onset date of August 11,

2010, and the date of the ALJ's decision. (Tr. 21).

23

## DISCUSSION

### 1.    Severe Impairments

Plaintiff contends that the ALJ erroneously concluded that she had no severe impairment other than major depressive disorder and anxiety. (Id. at 3). She asserts that the ALJ did not develop the record enough concerning her high glucose levels resulting from diabetes, and that the ALJ should have asked Plaintiff more questions during the hearing.  Plaintiff states:

> These lame rationalizations notwithstanding, the record in fact demonstrates that Plaintiff's diabetes mellitus is not merely a "severe" impairment, but a major source of limitation of functioning.  It led to episodes of syncope or near syncope.  R. 195, 144-147, 190, 367-72.  These forced her to stop working.

(Id. at 4).

Defendant disputes this claim, arguing that the ALJ's conclusion that Plaintiff's diabetes was not a severe impairment, either singly or in combination with other impairments, was harmless error.  Defendant asserts that Plaintiff has failed to meet his burden of proving that the error was not harmless because she failed to provide any evidence that if the ALJ had found that Plaintiff's diabetes was a severe impairment, she would have been found to be disabled.  (Doc. 17, pp. 9-10).  In her reply brief, Plaintiff asserts that the ALJ's failure to determine that her diabetes was severe is not a harmless error.  (Doc. 18, p. 2).

24

"The step-two inquiry is a de minimis screening device to dispose of groundless claims." Beasich v. Comm'r Soc. Sec., 66 Fed. Appx. 419, 428, 2003 WL 21299604, *8 (3d Cir. 2003). This portion of the sequential analysis places a burden on the claimant to show that his or her impairment is severe. 20 C.F.R. § 404.1520(c) (2000). An impairment is "severe" when it is "of magnitude sufficient to limit significantly the individual's '[ability] to do basic work activities.'" Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982), cert. dismissed, 461 U.S. 911, 77 L. Ed. 2d 280, (quoting 20 C.F.R. § 404.1520(c)). A non-severe impairment is one that does not significantly limit or has a minimal effect on a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). These basic work activities include: "(1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). "When assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each